# In the United States Court of Federal Claims

No. 04-155L
Filed: January 3, 2008
**TO BE PUBLISHED**

| | | |
|---|---|---|
| ROY WALKER and SHELLIE WALKER, | * | Certified Question; |
| Plaintiffs, | * | Collateral Estoppel; |
| v. | * | Federal Land Policy and Management Act, 43 U.S.C. §§ 1752(a), (g); |
| THE UNITED STATES, | * | Grazing Permit; |
| Defendant. | * | Just Compensation Clause of the Fifth Amendment of the U.S. Constitution; |
| | * | Regulatory Taking; |
| | * | Res Judicata; |
| | * | Summary Judgment; |
| | * | 28 U.S.C. § 1491(a)(1); |
| | * | 28 U.S.C. § 2501; |
| | * | N.M. Stat. Ann. § 72-1-3, *et seq*; |
| | * | 36 C.F.R. § 222.1, *et seq*; |
| | * | RESTATEMENT (SECOND) OF JUDGMENTS (1982) §§ 27(c), (e). |

**Lyman Daniel Bedford**, McQuaid, Bedford & Van Zandt, L.L.P., San Francisco, California, for Plaintiffs.

**Kristine Sears Tardiff**, United States Department of Justice, Environment & Natural Resources Division, Concord, New Hampshire, for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN, *Judge.***

This case involves allegations of the taking of grazing and water rights by the United States Forest Service on two allotments in the Gila National Forest of New Mexico.

For the reasons stated herein, Plaintiffs may not recover compensation under 43 U.S.C. § 1752(g), because Plaintiffs' grazing permit lawfully was cancelled. In addition, the court has determined that the Government has not taken any legally-cognizable property interest owned by Plaintiffs. Accordingly, the Government's August 31, 2007 Motion for Summary Judgment is granted.

To facilitate analysis of this Memorandum Opinion and Final Order, the following outline is provided:

**I. RELEVANT FACTS.**

**II. PROCEDURAL HISTORY.**

**A. In The United States District Court For The District Of New Mexico.**

**B. In The United States Court Of Federal Claims.**

**C. In The Supreme Court Of New Mexico.**

**III. DISCUSSION.**

**A. Jurisdiction.**

**B. Standard For Decision On Summary Judgment.**

**C. The Government's Motion For Summary Judgment Is Granted.**

**1. As A Matter Of Law, Plaintiffs Are Not Entitled To Compensation Under The Federal Land Policy And Management Act.**

**2. As A Matter Of Law, Plaintiffs Are Not Entitled To Just Compensation Under The Fifth Amendment To The United States Constitution.**

**a. Plaintiffs Own No Forage Nor Grazing Rights In The Allotments.**

**b. Plaintiffs Own No Water Sources Subject To The *Mimbres* Adjudication.**

**c. Plaintiffs Own Certain Water Sources Not Subject To The *Mimbres* Adjudication.**

**i. Res Judicata And Collateral Estoppel Do Not Bar Plaintiffs From Asserting Ownership Rights In Fourteen Other Water Sources.**

**ii. New Mexico Law Also Does Not Bar Plaintiffs From Filing Declarations Of Ownership In Fourteen Other Water Sources.**

iii. **Plaintiffs Have Established *Prima Facie* Ownership In Eleven Springs.**

iv. **Plaintiffs Have Established *Prima Facie* Ownership In The Royal John Tank.**

v. **Plaintiffs Have Not Established *Prima Facie* Ownership In The Test Well.**

d. **The Government Has Not Taken Any Property Interest Owned By Plaintiffs.**

i. **In Water Rights Not Subject To The *Mimbres* Adjudication.**

ii. **In Preference Grazing Rights.**

iii. **In The Walker Ranch.**

IV. **CONCLUSION.**

* * *

## I. RELEVANT FACTS.[1]

Roy and Shellie Walker ("Plaintiffs") own and raise cattle on the Walker Ranch in Grant County, New Mexico. *See* Walker Decl. ¶ 27; *see also* Compl. ¶¶ 4, 12-13. The Walker Ranch consists of 40 acres of land that is the "base property"[2] of two grazing allotments[3] in the Gila

---

[1] The relevant facts recited herein were discussed in *Walker* v. *United States*, 66 Fed. Cl. 57 (2005) ("*Walker I*") and derived from: the February 5, 2004 Complaint ("Compl."); the Government's May 4, 2004 Motion To Dismiss ("Gov't Mot. to Dis.") and Exhibits thereto ("Def. Ex."); Plaintiffs' August 16, 2004 Opposition ("Pl. Opp."); a July 19, 2004 Declaration of Ms. Shellie Walker ("Walker Decl."); the Government's August 18, 2004 Reply ("Gov't Reply"); Plaintiffs' June 17, 2005 Motion for Reconsideration ("Mot. for Recon."); the Government's August 1, 2005 Opposition ("Gov't Opp."); and Plaintiffs' August 30, 2005 Reply ("Pl. Reply").

[2] "Base property" is defined in the Code of Federal Regulations as "land and improvements owned and used by the permittee for a farm or ranch operation and specifically designated by him to qualify for a term grazing permit." 36 C.F.R. § 222.1(b)(3).

[3] An "allotment" is a "designated area of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1).

National Forest administered by the United States Forest Service ("the Government").[4] *See* Compl. ¶¶ 8-9.

On March 23, 1995, the Government issued a Ten Year Term Grazing Permit, No. 06-1099 ("grazing permit") authorizing Plaintiffs to graze 265 head of cattle and eight horses year round on approximately 17,826 acres on two allotments within the Gila National Forest, known as the Hot Springs and Cold Springs Allotments ("the Allotments").[5] *See* Walker Decl. ¶ 30; *see also* Def. Ex. 1 (grazing permit); Def. Ex. 2 (Declaration of District Ranger Gerald Engel ("Engel Decl.")) ¶ 6. On October 4, 1996, after a number of exchanges between the Government and Plaintiffs regarding conditions on the Allotments, the Government partially cancelled Plaintiffs' grazing permit. *See* Def. Ex. 15 at 47-48. On October 29, 1996, Plaintiff Roy Walker sent a letter to the Government asserting that Plaintiffs owned all surface rights in the Allotments and were not required to have a permit to graze cattle thereon. *See* Def. Ex. 16 at 50. On November 8, 1996, Plaintiffs' grazing permit was cancelled and Plaintiffs were directed to remove all livestock from the Allotments. *See* Def. Ex. 17 at 51; *see also* Engel Decl. ¶ 14; Walker Decl. ¶ 31. Plaintiffs did not file an administrative appeal. *See* Engel Decl. ¶ 15. Instead, Plaintiffs continued to assert that they owned the Allotments and were not required to have a permit to graze their cattle. *See* Def. Ex. 18 at 55; *see also* Walker Decl. ¶ 31. After the permit was cancelled, Plaintiffs continued to graze approximately 265 head of cattle on the Allotments. *See* Walker Decl. ¶¶ 31-32; *see also* Engel Decl. ¶ 16.

## II. PROCEDURAL HISTORY.

### A. In The United States District Court For The District Of New Mexico.

On May 7, 1997, the Government filed a Complaint in the United States District Court for the District of New Mexico ("United States District Court") alleging trespass, seeking damages, unpaid grazing fees, and an injunction enjoining Plaintiffs from continuing to graze livestock on the

---

[4] The Chief of the United States Forest Service is authorized to "develop, administer and protect the range resources and permit and regulate the grazing use of all kinds and classes of livestock on all National Forest System lands and on other lands under Forest Service control." 36 C.F.R. § 222.1(a).

[5] Permit No. 06-1099 superseded the grazing permits Plaintiffs purchased from their predecessors-in-interest. *See* Def. Ex. 1 (grazing permit).

Allotments. *See United States* v. *Roy Dee Walker and Shellie Ann Walker*, Case No. Civ. 97-641 (D.N.M., filed May 7, 1997) ("United States District Court action"); *see also* Def. Ex. 19 ¶¶ 1-6; Walker Decl. ¶ 33.

On June 9, 1997, Plaintiffs filed an Answer in the United States District Court action asserting ownership of all surface rights in the Allotments and a Counterclaim for Just Compensation under the Fifth Amendment to the United States Constitution. *See* Def. Ex. 20 at 78-80; *see also* Walker Decl. ¶ 34. On August 26, 1997, the Government filed a Motion to Dismiss the Counterclaim. *See* Def. Ex. 21 at 83. On October 7, 1997, Plaintiffs also filed a Motion to Dismiss. *Id*. On October 8, 1997, the Government filed a Motion for Summary Judgment. *Id*. During this period, Plaintiffs continued to graze cattle on the Allotments. *See* Walker Decl. ¶¶ 30, 32, 37.

On January 7, 1998, the United States District Court issued a Memorandum Opinion and Order: denying Plaintiffs' Motion to Dismiss; dismissing Plaintiffs' Counterclaim, without prejudice; and granting, in part, the Government's Motion for Summary Judgment. *See United States* v. *Roy Dee Walker and Shellie Ann Walker*, Case No. Civ. 97-641, slip op. at 6-7 (D.N.M., filed Jan. 7, 1998) ("Def. Ex. 21"). Therein, the United States District Court concluded:

> There is no legal basis for [Plaintiffs'] argument that they hold title to the "surface estate" of the Cold/Hot Springs [A]llotment. I find that [Plaintiffs] have no legal title to the Cold/Hot Springs [A]llotment and that their continued grazing of cattle upon the Cold/Hot Springs [A]llotment within the Gila National Forest without a permit constitutes a trespass.

Def. Ex. 21 at 87.

With respect to Plaintiffs' Counterclaim, however, the United States District Court determined that:

> [Plaintiffs' counterclaim must be] heard in the [United States] Court of Federal Claims [because it] seeks damages in excess of $670,500.00 plus other unenumerated economic losses as well as injunctive relief against [the Government]. Because this far exceeds the amount stated in the Tucker Act, [the United States District Court] has no jurisdiction . . . unless [Plaintiffs] stipulate that their claims will not exceed $10,000.

*Id.* at 88 (citations omitted).

On February 27, 1998, a Final Judgment was issued by the United States District Court: denying Plaintiffs' Motion to Dismiss; dismissing Plaintiffs' Counterclaim, without prejudice; granting the Government's Motion for Summary Judgment to enjoin Plaintiffs from grazing cattle without a permit; and requiring Plaintiffs to remove all livestock from the Allotments, no later than June 30, 1998. *See* Def. Ex. 22 at 90-91; *see also* Walker Decl. ¶ 38. Plaintiffs also were assessed

a $13,411.84 fine for unlawful grazing. *See* Def. Ex. 22 at 90-91. The Final Judgment, however, emphasized that: "[n]othing herein will be deemed a waiver of [Plaintiffs'] right to appeal this final judgment as to the liability for trespass, or to file a takings claim in the [United States] Court of Federal Claims with respect to the facts underlying this trespass action." *Id.* at 91. Plaintiffs did not appeal the Final Judgment of the United States District Court and removed all livestock from the Allotments by the June 30, 1998 deadline. *See* Walker Decl. ¶ 39.

**B. In The United States Court Of Federal Claims.**

On February 5, 2004, Plaintiffs filed a Complaint in the United States Court of Federal Claims ("the court") seeking compensation, pursuant to 43 U.S.C. § 1752(g) and the Just Compensation Clause of the Fifth Amendment to the United States Constitution ("Just Compensation Claim"). *See* Compl. ¶¶ 30-38.

The Just Compensation Claim alleged a taking of: (1) water rights in the Allotments through physical appropriation and a denial of all economic uses of the water, including a deprivation of all reasonable, investment-backed expectations; (2) the Walker Ranch, in that the water, forage, and grazing rights are essential to ranch operations, depriving Plaintiffs of all economically viable use thereof and all reasonable, investment-backed expectations; and (3) Plaintiffs' preference grazing rights in the Allotments. *See* Compl. ¶¶ 32-34.

On May 4, 2004, the Government filed a Motion to Dismiss arguing that: "[a]ll of plaintiff's claims are barred by the applicable six year statute of limitations, 28 U.S.C. § 2501, because such claims accrued when plaintiffs' term grazing permit was cancelled by the Forest Service in November 1996, which is nearly 7 ½ years prior to the filing of their Complaint on February 5, 2004." Gov't Mot. To Dis. at 1. On August 16, 2004, Plaintiffs filed an Opposition, explaining that their claims did not accrue until June 30, 1998, the date the United States District Court's injunction became effective. *See* Pl. Opp. at 9-20 (Plaintiffs initially stated that February 27, 1998, the date of the District Court's opinion, was the accrual date, but subsequently Plaintiffs indicated that the date of accrual was June 30, 1998, the date the United States District Court's injunction became effective). On August 18, 2004, the Government filed a Reply.

* * *

On December 16, 2004, this case was reassigned to the undersigned judge from the Honorable Diane G. Sypolt. On May 31, 2005, the court issued a Memorandum Opinion and Order granting the Government's Motion to Dismiss as to: the First Cause of Action, set forth in paragraphs 1-32 of the Complaint, for compensation for the alleged taking of Plaintiffs' property interests in the Allotments; the Third Cause of Action, set forth in paragraphs 1-31 and 34 of the Complaint, for compensation for the alleged taking of Permit No. 06-1099; and the Fourth Cause of Action, set forth in paragraphs 1-29 and 35-38 of the Complaint, for compensation, pursuant to 43 U.S.C. § 1752(g). *See Walker I*, 66 Fed. Cl. at 65-68 (holding that collateral estoppel barred relitigation of the existence of the property interest alleged in the First Cause of Action). The court

held, however, that the Second Cause of Action for just compensation for the taking of Plaintiffs' ranch, in paragraphs 1-31 and 33(A)-33(E) of the Complaint, survived the Government's Motion to Dismiss. *Id.* at 67.

On June 17, 2005, Plaintiffs filed a Motion for Reconsideration. On August 1, 2005, the Government filed a Response. On August 30, 2005, Plaintiffs filed a Reply. On October 31, 2005, the court issued a Memorandum Opinion and Order Granting, In Part, Plaintiffs' Motion To Reconsider, Certifying Questions Of State Law To The Supreme Court Of New Mexico And Denying The Government's Motion To Dismiss. *See Walker* v. *United States*, 69 Fed. Cl. 222 (2005) ("*Walker II*"). Therein, the court determined that it:

> erred in holding that the Plaintiffs are collaterally estopped from asserting their Just Compensation claims in the United States Court of Federal Claims, because the United States District Court's judgment that [Plaintiffs] did not have legal title to the Allotments is now final and binding on this court. This error arose from the court's mistaken belief that for [Plaintiffs] to bring a claim based on the taking of the surface rights of the Allotments, including water, forage, and access rights, [Plaintiffs] must first establish ownership of a property interest in [the] surface estate in the Allotments at the time of the alleged taking. On reconsideration, the court has learned that the water, access, and forage rights that the Plaintiffs claim to possess, to the extent they are recognized by New Mexico law, are legally distinct from the surface estate rights addressed by the United States District Court's prior decision.

*Id*. at 226-27 (citations omitted).

The court was able to determine that appropriative water rights and a "right of way and other instrumentalities for the maintenance and enjoyment" thereof are recognized by New Mexico law as independent property interests. *Id*. at 230-32. New Mexico law, however, was silent as to whether forage rights are incident to or an aspect of vested water rights or ditch rights-of-way. *Id*. Accordingly, the court denied the Government's May 4, 2004 Motion to Dismiss[6] and requested that the Supreme Court of the State of New Mexico ("the Court") answer the following certified questions:

---

[6] The court also denied the Government's May 4, 2004 Motion to Dismiss on statute of limitation grounds. *See Walker II*, 69 Fed. Cl. at 233. The court determined that "the permissible uses of the Plaintiffs' alleged water rights were not known to a reasonable degree" until the United States District Court issued the February 28, 1998 Final Judgment, because Plaintiffs alleged to have continued to utilize their alleged appropriation rights until that date. *Id.* (citing *Caldwell* v. *United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (holding that "a taking occurs when the owner is deprived use of the property")). Therefore, Plaintiffs' February 5, 2004 Complaint was filed within the Tucker Act's six-year statute of limitations. *Id*. at 233-34.

> 1. Does the law of the State of New Mexico recognize a limited forage right implicit in a vested water right?
>
> 2. Does the law of the State of New Mexico . . . recognize a limited forage right implicit in a right-of-way for the maintenance and enjoyment of a vested water right?

*Id*. at 232-33.

**C. In The Supreme Court Of New Mexico.**

On December 8, 2005, the Supreme Court of the State of New Mexico accepted certification and ordered a briefing schedule. Thereafter, the parties were informed that the court would take no further action until the certified questions were answered. The Government, however, filed a July 5, 2006 Motion for Summary Judgment ("Gov't SJ Mot. I") and Appendix of Exhibits attached thereto ("Def. Ex. 26-31") that: claimed the "vast majority . . . of the water rights that are subject to this case are owned by the United States rather than by Plaintiffs or their predecessors-in-interest;" requested the court reconsider the accrual date in light of new precedent; and requested the court to "withdraw its certification order pending resolution of Defendant's motion for summary judgment." *See* Gov't SJ Mot. I at 5, 25-29. The court denied the Government's motion, because Plaintiffs' taking claims were predicated on an injunction obtained by the Government, not on a final agency action. *See Walker* v. *United States*, 72 Fed. Cl. 186, 187 (2006) ("*Walker III*") (citing *Goodrich* v. *United States*, 434 F.3d 1329, 1336 (Fed. Cir. 2006) (holding that plaintiff-appellant's takings claim accrued when an agency issued a final Record of Decision). In addition, the court determined in other respects that the Government's July 5, 2006 Motion for Summary Judgment was premature, but "may be refiled after the Supreme Court of the State of New Mexico answers the certified questions." *Id*. at 187.

On June 21, 2007, the Supreme Court of the State of New Mexico issued an opinion answering both certified questions in the negative, holding that the laws of the State of New Mexico do not recognize a limited forage right implicit in a vested water right nor a limited forage right implicit in the right-of-way for the maintenance and enjoyment of a vested water right. *See Walker* v. *United States*, 162 P.3d 882, 884 (N.M. 2007) ("*Walker IV*"). Significantly, the Supreme Court of the State of New Mexico assumed "that [Plaintiffs] do have a valid water right as they claim," but nevertheless held that Plaintiffs "do not have any property rights under federal law to the surface estates of the allotments" and that "all federal authority on this matter is contrary to the position [Plaintiffs] now ask this Court to endorse." *Id*. at 885-88 (citing *Diamond Bar Cattle Co.* v. *United States*, 168 F.3d 1209 (10th Cir. 1999) (holding that under New Mexico law private ranchers do not have grazing rights incident to their water rights on federal lands); *cf. Colvin Cattle Co.* v. *United States*, 67 Fed. Cl. 568, 574 n.5 (2005), *aff'd*, 468 F.3d 803, 806 (Fed. Cir. 2006) (observing that water rights under Nevada law do not include an appurtenant right to graze on federal land)).

Next, the Supreme Court of the State of New Mexico discussed in detail the historical origins of the Prior Appropriations Doctrine that governs water rights in New Mexico. *See Walker IV*, 162 P.3d at 888-89. The court explained that the Doctrine's principle, that "a water right is separate and distinct from the right to adjacent land," was the result of the arid conditions of New Mexico. *Id*. (citations omitted) ("Because water is a scarce commodity in the West, mobility and transferability are necessary to meet changing social goals."). Nevertheless, Plaintiffs' argument that New Mexico Statutory Section 19-3-13 conferred a "possessory interest in an easement to stock the public range in conjunction with water ownership" was rejected, because that state statute:

> and its predecessor recognize merely a right in use of the license to graze on public lands, allowing those with sufficient water rights to support cattle on such lands to exclude others without a water right . . . . This Court has never indicated that a person raising cattle pursuant to a license has any separate interest in the public domain, aside from water rights protected by the Mining Act [of 1866, 43 U.S.C. § 661], that can be asserted against the United States government if that license is lost.

*Id*. at 891 (citing N.M. Stat. Ann. § 19-3-13).

The Supreme Court of the State of New Mexico also held that "beneficial use" does not give "rise to a right to continue a particular beneficial use on the particular land upon which a water right is initially established," observing that Plaintiffs were not forced into non-use by the cancellation of their permit, because water rights may be severed from the land and "the requirement that water must be put to beneficial use does not give rise to an interminable right to continue that same beneficial use." *Id*. at 891-92.

In addition, Plaintiffs' argument that they "have an implicit right to land incident to their water right" was rejected. *Id.* at 892 (citing *First State Bank of Alamogordo* v. *McNew*, 33 N.M. 414 (1928)). The Court concluded that neither *McNew* nor any other New Mexico case supports the proposition that a land interest is incident to a water right. *Id*. at 893. Likewise, Plaintiffs' suggestion that, because water access is indispensable to ranching in New Mexico, stock watering rights include the right to "other resources associated with stock watering," was rejected. *Id.* at 894. Discerning no legal authority for this proposition, the Supreme Court of the State of New Mexico concluded: "[t]he self-evident fact that grazing will occur in areas adjacent to stock watering facilities does not translate into a legally enforceable right to graze by virtue of a stock watering right;" instead, any such right must be derived from an "independent source of authority related to the land." *Id*.

Finally, the Supreme Court of the State of New Mexico rejected Plaintiffs' contention that "a forage right is implicit in a right-of-way developed for the enjoyment of [a] water right." *Id*. at 895-96. The Court recognized that the Mining Act of 1866 conveys a limited property interest in public lands for a right-of-way to construct ditches and canals to transport water. *See* 43 U.S.C. § 661 (2000). In addition, New Mexico also reserves ownership of vegetation surrounding such ditches and canals to the landowner, but a right-of-way over private land to access water also is

limited only to "storage or conveyance." *Id*. (citing N.M. Stat. Ann. §§ 72-1-5, 73-2-10). Therefore, the New Mexico Supreme Court reasoned that "if a right of way for enjoyment of a water right through private lands . . . is so limited, there is no reason why a right-of-way through public land would be any broader." *Id*. at 896.

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, 28 U.S.C. § 1491(a)(1), authorizes the United States Court of Federal Claims to render judgment and award money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States* v. *Testan*, 424 U.S. 392, 397-98 (1976). The United States Supreme Court, however, has held that the Tucker Act does not create any substantive right for monetary damages. *See United States* v. *Mitchell*, 445 U.S. 535, 538 (1980). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages in order for the court to have jurisdiction. *See Khan* v. *United States,* 201 F.3d 1375, 1377 (Fed. Cir. 2000). In this case, Plaintiffs' Complaint asserts a claim for compensation, pursuant to 43 U.S.C. § 1752(g) and the Just Compensation Clause of the Fifth Amendment to the United States Constitution. *See* Compl. ¶¶ 30-38; *see also* 43 U.S.C. § 1752(g). Accordingly, Plaintiffs have established jurisdiction by identifying and pleading a federal statute and constitutional provision providing a substantive right to money damages.

The court previously concluded that Plaintiffs' claims accrued within the Tucker Act's six year statute of limitations. *See Walker II*, 69 Fed. Cl. at 233 ("[T]he Government's Motion to Dismiss on the basis of the statute of limitations must be denied."). In *Walker II*, the court held that "the permissible uses of the Plaintiffs' alleged water rights were not known to a reasonable degree" until the Unites States District Court's February 27, 1998 Final Judgment, because Plaintiffs alleged to have continued to utilize their alleged appropriation rights until that judgment date. *Id.*; *see also Boling*, 220 F.3d at 1370 (a Just Compensation claim "accrues when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence."). Accordingly, Plaintiffs' Complaint was filed within the six year statute of limitations.

On August 31, 2007, the Government filed a Motion for Summary Judgment And Supporting Memorandum On All Remaining Claims ("Gov't SJ Mot. II") and Proposed Findings Of Uncontroverted Fact ("Gov't Facts") in the United States Court of Federal Claims. On October 18, 2007, Plaintiffs filed a Response to both the August 31, 2007 Motion For Summary Judgment ("Pl. Resp.") and Proposed Findings Of Uncontroverted Fact ("Pl. Facts Resp."), together with: Proposed Findings Of Uncontroverted Fact ("Pl. Facts"); a Declaration Of Shellie Walker In Support Of Plaintiffs' Opposition To Defendant's Motion For Summary Judgment ("Walker Decl. II"); and copies of January 15, 1997 Declarations Of Ownership Of Water Rights, filed with the New Mexico Engineer Office ("Pl. Resp. Ex. A"). On October 31, 2007, Plaintiffs filed an Amendment to the October 18, 2007 Proposed Findings Of Uncontroverted Fact. On November 28, 2007, the

Government filed a Reply ("Gov't Reply II") and a Response To Plaintiffs' Proposed Findings Of Uncontroverted Fact ("Gov't Fact Resp."). The resolution of the Government's August 31, 2007 Motion For Summary Judgment is now ripe.

**B. Standard For Decision On Summary Judgment.**

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Am. Pelagic Fishing Co.* v. *United States*, 379 F.3d 1363, 1370-71 (Fed. Cir. 2004) ("Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law."). Only genuine disputes of material fact that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id*. Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding that the moving party may meet its burden "by 'showing' – that is, pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). A motion for summary judgment may be made without supporting affidavits and rely "solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id*. at 324. Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial."). A dispute over a material fact is "genuine" where a reasonable fact-finder could find for the non-movant. *See Anderson*, 477 U.S. at 248.

A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). All reasonable inferences and presumptions must be resolved in favor of the non-moving party. *See Anderson*, 477 U.S. at 255; *see also Caterpillar, Inc.* v. *Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."); *Gasser Chair Co., Inc.* v. *Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (requiring the trial court to view the evidence in a light most favorable to the non-moving party and to draw all reasonable inferences in favor of the non-moving party).

### C. The Government's Motion For Summary Judgment Is Granted.

#### 1. As A Matter Of Law, Plaintiffs Are Not Entitled To Compensation Under The Federal Land Policy And Management Act.

The Complaint's Second Cause of Action seeks compensation under 43 U.S.C. § 1752(g), providing that:

> [w]henever a permit of lease for grazing domestic livestock [issued pursuant to the Federal Land Policy and Management Act] is cancelled in whole or in part, in order to devote the lands covered by the permit or lease to another public purpose, including disposal, the permittee or lessee shall receive from the United States a reasonable compensation for the adjusted value, to be determined by the Secretary concerned, of his interest in authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease, but not to exceed the fair market value of the terminated portion of the permittee's or lessee's interest therein.

43 U.S.C. § 1752(g); *see also* Compl. ¶¶ 35-38 (Second Cause of Action).

Plaintiffs contend that the Government's actions were a *de facto* cancellation of their March 23, 1995 Ten Year Term Grazing Permit for "another public purpose to the exclusion of grazing cattle." Compl. ¶¶ 37-38; *see also* Walker Decl. ¶ 30 (discussing Permit); Def. Ex. 1 (The Grazing Permit); Engel Decl.

The record evidences, however, that the Government cancelled the permit, because Plaintiffs failed to remove some of their cattle in the Allotments when requested by the Government and failed to pay required grazing fees. *See Walker I*, 66 Fed. Cl. at 60; *see also Hage* v. *United States*, 35 Fed. Cl. 147, 179 (1996) ("To prevail [under § 1752(g)], plaintiffs must demonstrate that . . . defendant actually cancelled the permit not to enforce the permit terms but rather to have access to the water and allotments for use by the Forest Service[.]"). The Federal Land Policy and Management Act authorizes the Government to "cancel or suspend a grazing permit or lease for any violation of a grazing regulation or of any term or condition of such grazing permit or lease." 43 U.S.C. § 1752(a). Plaintiffs' March 23, 1995 Ten Year Term Grazing Permit explicitly provides that "[t]he permittee will remove livestock from Forest Service-administered lands before the expiration of the designated grazing season upon request of the Forest officer when it is apparent that further grazing would damage the resources." Def. Ex. 1 ¶ 8, at 2 (grazing permit). The permit also provides that "it is fully understood and agreed that this permit may be suspended or cancelled, in whole or in part, after written notice, for failure to comply with . . . the instructions of Forest officers[.]" *Id.* ¶ 3, at 1 (grazing permit).

The record also confirms that the Government requested that Plaintiffs reduce their cattle in the Allotments to ameliorate grass decimation caused by overgrazing and drought conditions. *See Walker I*, 66 Fed. Cl. at 58-60; *see also* Def. Ex. 6 (May 16, 1996 USDA Forest Service letter to

Plaintiff Roy Walker stating purpose for the request to remove Plaintiffs' cattle). As the court previously found: "[Plaintiffs] were advised that failure to comply [with the Government's request to reduce Plaintiffs' cattle] would result in suspension and/or cancellation of the March 23, 1995 grazing permit and ordered to show cause . . . why the grazing permit should not be revoked." *Walker I*, 66 Fed. Cl. at 60 (citing Def. Ex. 12 at 35-36 (Aug. 20, 1996 USDA Forest Service letter from Mr. Gerald A. Engel to Plaintiff Roy Walker). Since Plaintiffs refused to remove their cattle and pay their grazing fees, "[o]n November 8, 1996, Permit No. 06-1099 was cancelled in its entirely and [Plaintiffs] were directed to remove all remaining livestock from the allotments." *Id*. (citing Def. Ex. 17, at 51 (Nov. 8, 1996 USDA Forest Service letter from Mr. Gerald A. Engel to Plaintiff Roy Walker)). The record also evidences that Plaintiffs were provided written notice of the suspensions and eventual cancellation of their grazing permit. *See* Def. Ex. 13, 15, 17 (USDA Forest Service letters providing notice of suspension and cancellation of Plaintiffs' grazing permit).

For these reasons, the court has determined that Plaintiffs' grazing permit was cancelled as a penalty for failure to comply with the terms of the permit, not for some other public purpose. Therefore, Plaintiffs may not recover compensation under 43 U.S.C. § 1752(g).

#### 2. As A Matter Of Law, Plaintiffs Are Not Entitled To Just Compensation Under The Fifth Amendment To The United States Constitution.

##### a. Plaintiffs Own No Forage Nor Grazing Rights In The Allotments.

Plaintiffs claim that they purchased "range rights, forage rights, access rights, and range improvements . . . on the appurtenant grazing allotments, all of which were established under New Mexico law over 115 years ago." Pl. Resp. at 1; *see also* Walker Decl. ¶¶ 21-24. Since the late nineteenth century and up to the present dispute, Plaintiffs claim that they and their predecessors-in-interest made use of these rights by grazing cattle in the Allotments. *See* Pl. Resp. at 2. Both the United States District Court for the District of New Mexico and the Supreme Court of the State of New Mexico, however, have held, as a matter of law, that Plaintiffs "do not have any property rights under federal law to the surface estates of the allotments." *See Roy Dee Walker and Shellie Ann Walker*, Case No. Civ. 97-641, slip op. at 5 (D.N.M., filed Jan. 7, 1998) (Def. Ex. 21) ("There is no legal basis for [Plaintiffs'] argument that they hold title to the 'surface estate' of the [Allotments]. I find that [Plaintiffs] have no legal title to the [Allotments] and that their continued grazing of cattle upon the [Allotments] without a permit constitutes a trespass."); *see also Walker IV*, 162 P.3d at 885 ("As stated earlier, it is also clear that [Plaintiffs] do not have any property rights under federal law to the surface estate of the allotments.").

Furthermore, the Supreme Court of the State of New Mexico held that New Mexico does not recognize a limited forage right implicit in a vested water right nor a limited forage right implicit in the right-of-way for the maintenance and enjoyment of a vested water right. *See Walker IV*, 162 P.3d at 884. Likewise, the Court rejected Plaintiffs' argument that New Mexico Statutory Section 19-3-13 confers a "possessory interest in an easement to stock the public range in conjunction with water ownership," explaining that Section 19-3-13 "and its predecessor recognize merely a right in use of the license to graze on public lands." *Id*. at 891 (citing N.M. Stat. Ann. § 19-3-13). The Court also determined that the beneficial use requirement does not give "rise to a right to continue a particular

beneficial use on the particular land upon which a water right is initially established," because water rights may be severed from the land. *Id*. at 891-92. Therefore, Plaintiffs were not forced into non-use and "the requirement that water must be put to beneficial use does not give rise to an interminable right to continue that same beneficial use." *Id*. The New Mexico Supreme Court also observed that "[t]he self-evident fact that grazing will occur in areas adjacent to stock watering facilities does not translate into a legally enforceable right to graze by virtue of a stock watering right," which must come from an "independent source of authority related to the land." *Id.* at 894. Finally, as previously discussed, the Court rejected Plaintiffs' contention that "a forage right is implicit in a right-of-way developed for the enjoyment of [a] water right." *Id*. at 895-96. Although the Mining Act of 1866 recognizes a property interest in public lands for a right of way for construction of ditches and canals to transport water, *see* 43 U.S.C. § 661 (2000), New Mexico law expressly states that vegetation surrounding such ditches and canals belongs to the landowner, and a right-of-way to access water is limited to "storage or conveyance." *Id*. (citing N.M. Stat. Ann. §§ 72-1-5, 73-2-10).

Therefore, as a matter of law, Plaintiffs own no forage nor grazing rights in the Allotments.

**b. Plaintiffs Own No Water Sources Subject To The *Mimbres* Adjudication.**

Plaintiffs claim ownership rights in 40 water sources located in the Allotments. *See* Pl. Resp at 1-7. Plaintiffs' alleged water sources, with one exception, are located within the Mimbres River Stream System and Mimbres Underground Water Basin. *See* Gov't SJ Mot. at 8.

The Government argues, however, that ownership rights to 26 of Plaintiffs' alleged water sources in the Allotments were awarded to the United States in a prior New Mexico state court adjudication. *See id*. at 2, 8 (citing *Mimbres Valley Irrigation Co.* v. *Salopek*, No. 6329 (Sixth Judicial District Court, Luna County, New Mexico) ("the *Mimbres* Adjudication")).[7] The *Mimbres* case was commenced in 1966 "as a private action to enjoin alleged illegal diversions of the Rio Mimbres," but subsequently was converted to a general statutory adjudication[8] to determine under

---

[7] The 26 water sources subject to the *Mimbres* Adjudication include: Mother Yates Spring; Squirrel Spring; Donahue Park Spring; Old Camp Spring; Upper Middle Hot Spring; Upper Hot Spring; Sawmill Spring; Shag Spring; Middle Donahue Spring; Middle Hot Spring; Hot Springs Pipeline; Rocky Tank; Gold Pan Tank; Upton Tank; Fogarty Wire Corral Tank; Acklin Tank; Little Corral Tank; Masonry Dam; Getaway Tank; Upper Corral Canyon Tank; Pine Park Tank; Walnut Grove Well; Fogarty Well; Upton Well; Hot Springs Well; and Donahue Well. *See* Pl. Facts at 3-4; *see also* Pope Decl. (Def. Ex. 30) ¶¶ 14, 17, 20, 22.

[8] A general statutory adjudication in New Mexico is described under N.M. Stat. Ann. § 72-4-17:

> In any suit for the determination of a right to use the waters of any stream system, all those whose claim to the use of such waters are of record and all other claimants, so

New Mexico law "the exact rights of each user to water from" the Mimbres River Stream System and Mimbres Underground Water Basin. *Id*. at 8 (citing *Mimbres Val. Irrigation Co.* v. *Salopek*, 564 P.2d 615, 615-16 (N.M. 1977), *aff'd* 438 U.S. 696 (1978), and *United States* v. *New Mexico*, 438 U.S. 696, 698 (1978)).

Plaintiffs' predecessors-in-interest, Mr. Chris Dominguez and Mr. Louis Oliver, were defendants in the *Mimbres* Adjudication. In 1974 and 1987, the Sixth Judicial District Court, Luna County, New Mexico ("state court"), issued orders establishing their respective rights in the water. *Id*. at 9 (citing Order, Case No. 6326, Sub-File No. 672, Defendant Dominguez (Def. Ex. 25) ("Dominguez Order") and Order, Case No. 6326, Sub-File No. 761, Defendant Oliver (Def. Ex. 26) ("Oliver Order")). The state court determined that Mr. Dominguez had a right to divert and utilize limited surface water of the Mimbres River System to irrigate a parcel of land, but that "[n]either the water source nor the land to be irrigated are located within the [Allotments]." Gov't SJ Mot. II at 9 (citing Dominguez Order). Therefore, the state court declared that:

> The defendant [Dominguez] has no surface or underground water rights in the Rio Mimbres Stream System and/or the Mimbres Underground Water Basin, other than those referred to in this Order and those other Orders entered by this Court in this cause regarding other lands owned by the said defendant in the said stream system or basin . . . .[This order permanently enjoins Dominguez] from any use of the public surface or underground waters of the Rio Mimbres Stream System and/or the Rio Mimbres Underground Water Basin, except in strict accordance with the water right described herein.

Dominguez Order (Def. Ex. 25).

In addition, the state court determined that Mr. Oliver also had a right to divert and utilize limited surface water from the Mimbres Underground Water Basin to irrigate "approximately 3.3 acres of land identified in the order," but that "neither the water source nor the land to be irrigated are located within the [Allotments]." Gov't SJ Mot. II at 9-10 (citing Oliver Order). Therefore, the state court held that Mr. Oliver owned "no surface or underground water rights in the Rio Mimbres Stream System and/or the Mimbres Underground Water Basin," other than those specified in the

---

> far as they can be ascertained, with reasonable diligence, shall be made parties. When any such suit has been filed the court shall, by its order duly entered, direct the state engineer to make or furnish a complete hydrographic survey of such stream system as hereinbefore provided in this article, in order to obtain all data necessary to the determination of the rights involved . . . . The court in which any suit involving the adjudication of water rights may be properly brought shall have exclusive jurisdiction to hear and determine all questions necessary for the adjudication of all water rights within the stream system involved[.]

N.M. Stat. Ann. § 72-4-17.

orders released in the Adjudication. *Id*. at 10 (citing Oliver Order). Finally, as with Mr. Dominguez, the state court permanently enjoined Mr. Oliver from "any use of the public surface or underground waters of the Rio Mimbres Stream System and/or the Rio Mimbres Underground Water Basin, except in strict accordance with the water right described herein." *Id*. (citing Oliver Order).

A 1990 Amended Stipulation in the *Mimbres* Adjudication identified 263 water sources in total, including 26 sources located in the Allotments, that were "acquired by the United States under New Mexico state law, including rights to waters of the Mimbres River stream system and underground basin that are located on the [Allotments]." *Id*. at 10, 22 (citing Def. Ex. 27 (Aug. 31, 1990 Amended Stip. On The United States' Water Rights Claims In Mimbres Valley, 6326, Subfile No. 914, Defendant United States) ("Amended Stipulation") and Def. Ex. 28 (Sept. 5, 1990 Order Approving Amended Stipulation)).

On January 14, 1993, a Final Decree was entered confirming and approving all "orders adjudicating the water rights of each and every defendant in this case as against the State of New Mexico." *See* Def. Ex. 29 at 3 (Jan. 14, 1993 *Mimbres* Final Decree, Case No. 6326). The Final Decree also provided that any claim "to divert or use the public waters of the Mimbres River Stream System and Mimbres Underground Water Basin not heretofore filed with the Court, shall not be adjudicated by the Court except as may be necessary for the correction of mistakes or omissions," and that all defendants and their successors are enjoined from diversions or use of these waters "except in accordance with the adjudication orders and this decree." *Id*. Therefore, the Government contends that the *Mimbres* Adjudication awarded the Government ownership of 26 water sources in the Allotments. *See* 1990 Amended Stipulation (Def. Ex. 27); and Order Approving Amended Stipulation (Def. Ex. 28). Plaintiffs' predecessors were awarded no ownership of water sources in the Allotments. *See* Dominguez Order (Def. Ex. 25); Oliver Order (Def. Ex. 26).

In this case, in addition to the 1993 Final Decree and Dominguez and Oliver Orders, the Government submitted a June 30, 2006 Declaration of Mr. Ralph D. Pope, Rangeland Management Specialist for the Gila National Forest, to confirm that: "nearly all of the water rights claimed by [Plaintiffs] in this case were at issue in the *Mimbres* adjudication and were awarded to the United States in that adjudication." *See* Gov't SJ Mot. II at 23-24 (citing Pope Decl. (Def. Ex. 30)). This conclusion was reached after Mr. Pope compared water sources documented by Forest Service records with: the 1990 Amended Stipulation; the Declaration of Plaintiff Shellie Walker; and affidavits of Plaintiffs' predecessors-in-interest, Mr. Dominguez and Mr. Oliver. *Id*. at 24 (citing Pope Decl. ¶¶ 10-26; Walker Decl. Ex. B (Feb. 24, 1997 Dominguez Affidavit); and Walker Decl. Ex. G (Feb. 24, 1997 Oliver Affidavit)). Mr. Pope then determined that after the *Mimbres* Adjudication the Government owns: ten of the twelve stock tanks claimed to be owned by Plaintiffs in this case; five of the six wells claimed to be owned by Plaintiffs in this case; and ten of the various springs claimed to be owned by Plaintiffs in this case. *Id*. at 24-25 (citing Pope Decl. ¶¶ 17, 20, 22).

Plaintiffs respond that they own 40 water sources in the Allotments, pursuant to the Mining Act of 1866 and the Prior Appropriations Doctrine, because "[Plaintiffs] and their predecessors have made beneficial use of the water associated with the 40 rights in dispute for stock watering purposes since 1888." Pl. Resp. at 5-6 (citing *Jennison* v. *Kirk*, 98 U.S. 453, 457 (1878) (The Mining Act, 43 U.S.C. § 661 (1866), gave "the sanction of the United States, the proprietor of the lands, to

possessory rights, which had previously rested solely upon the local customs, laws, and decisions of the court, and to prevent such rights from being lost on a sale of the lands.") and *Walker IV*, 162 P.3d at 888 ("Under the [D]octrine of [P]rior [A]ppropriation, water rights are both established and exercised by beneficial use, which forms 'the basis, the measure, and the limit of the right to the use of water.'") (citing N.M. Const. Art. XVI, § 3)). Plaintiffs also rely on New Mexico's 1907 Comprehensive Water Code in asserting ownership of the aforementioned water sources. *See* Pl. Resp. at 7. The New Mexico Water Code provides that all water rights vested prior to March 19, 1907, shall: "relate back to the initiation of the claim;" "be recognized as of the same force and effect" as rights filed after 1907; and be documented and established by filing certified declarations with the State Engineer, as "prima facie evidence of the truth of their contents." Pl. Resp. at 7 (citing N.M. Stat. Ann. §§ 72-1-2, 72-1-3, 72-1-4). Plaintiffs insist that they established these "vested rights" by filing Declarations Of Ownership with the New Mexico State Engineer. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership Of Water Rights, filed with the New Mexico Engineer Office); *see also* Walker Decl. Ex. B, G (Feb. 24, 1997 Dominguez and Oliver Affidavits) (affirming possession and continuous use of allotment water rights since 1971).

Plaintiffs dispute the Government's characterization of the scope the *Mimbres* Adjudication's Final Decree. Two prior decisions, *Mimbres Val. Irrigation Co.* v. *Salopek*, 564 P.2d 615 (N.M. 1977), *aff'd* 438 U.S. 696 (1978) and *United States* v. *New Mexico*, 438 U.S. 696 (1978), held that the United States Forest Service does not have "reserved" water rights in the Rio Mimbres River System for stock watering purposes and, instead, any such rights must be "allocated under state law to individual stockwaterers." Pl. Resp. at 8-9 (citing *Salopek*, 564 P.2d at 615 and *New Mexico*, 438 U.S. at 716). Plaintiffs, as "individual stockwaterers," however, acquired and perfected their rights to stock watering under New Mexico law and still retain those rights, despite the fact that the water sources are now located on federal lands. *Id*. at 9. Therefore, even if the United States was awarded "a limited amount of water from 263 water rights for stock watering," the 1990 Amended Stipulation "did not cover all water rights that are in dispute in this case." *Id*. (citing Def. Ex. 27 (Amended Stipulation). Accordingly, Plaintiffs assert that the 1990 Amended Stipulation only granted the Government rights to water "livestock and wildlife," not to exceed "a certain amount of acre-feet per year." *Id*. at 14-15 (citing Def. Ex. 26-28).

In contrast, Plaintiffs have made "beneficial use" of the water in the Allotments for grazing, and thus, under the Prior Appropriations Doctrine and New Mexico's Water Code, are the true owners of the water rights in the Allotments, not the Government. *Id.* at 15-16 (citing *Walker IV*, 162 P.3d at 888-89 ("Under the [D]octrine of [P]rior [A]ppropriation, water rights are both established and exercised by beneficial use . . . that right must be exercised or lost; one cannot sit on water rights to the exclusion of any other claimant without putting them to beneficial use.")). Therefore, Plaintiffs maintain that "[i]f the United States does not exercise their [sic] right to use the water for stock watering purposes[,] then it loses that right." *Id*. at 16. Moreover, even if "the United States are [sic] the owners of the 26 water rights in dispute, [the Government] may be only the legal title holder to these water rights which are held in trust for beneficial users such as [Plaintiffs]." *Id*. (citing *United States* v. *Pioneer Irrigation Dist*., 157 P.3d 600, 602 (Idaho 2007) (holding that the United States Bureau of Reclamation had only nominal legal title to water rights at issue, and that "equitable title" rested with landowners making beneficial use of the water.). Thus, equitable title to the water rights resides with Plaintiffs. *Id*. at 17.

Finally, Plaintiffs maintain that the *Mimbres* Adjudication Final Decree is applicable only to water for irrigation purposes, because "stock watering was not mentioned in the orders." *Id*. Therefore, the *Mimbres* Adjudication did not adjudicate rights of claimants, including Plaintiffs' predecessors-in-interest, who used "underground water exclusively for domestic or stock watering purposes." *Id*. (citing Def. Ex. 29 (*Mimbres* Final Decree, Case No. 6326, at 1-2)). Since New Mexico irrigation water rights are appurtenant to the land, while all other water rights are severable from the land, *Mimbres* "only meant to adjudicate [Dominguez's and Oliver's] irrigation water rights." *See* Pl. Resp. at 18 (citing *Walker IV*, 162 P.3d at 889 ("Irrigation water rights are appurtenant to the land, meaning that any conveyance of the land will carry the water right with it unless the water right is expressly reserved by the grantor.")).

As previously discussed, Plaintiffs' predecessors-in-interest were defendants in the *Mimbres* Adjudication, wherein the New Mexico state court issued orders awarding neither Dominguez nor Oliver any rights to water sources in the Allotments. *See* Def. Ex. 25 (Dominguez Order); Def. Ex. 26 (Oliver Order); *see also* Pl. Facts Resp. ¶¶ 9-10, at 5 (conceding that neither Oliver nor Dominguez were awarded any water rights in the Allotments). Instead, the state court permanently enjoined Dominguez and Oliver from "any use of the public surface or underground waters of the Rio Mimbres Stream System and/or the Rio Mimbres Underground Water Basin, except in strict accordance with the water rights described[.]" *See* Def. Ex. 25-26. Those Orders became final, upon entry of the 1993 Final Decree. *See* Def. Ex. 29 (*Mimbres* Final Decree, Case No. 6326)). Therefore, as a matter of law, Plaintiffs have no ownership rights in the 26 water sources in the Allotments that were subject to the *Mimbres* Adjudication. *See Graybill* v. *U.S. Postal Service*, 782 F.2d 1567, 1571 (Fed. Cir. 1986) (The Full Faith and Credit Clause "requires that state court judgments be given the same preclusive effect in later federal actions as they would be given under the laws of the state in which the judgments were rendered.") (citations omitted).

Moreover, Plaintiffs misinterpret the scope of *Salopek* and *New Mexico* in arguing that the Government "does not have 'reserved' water rights for . . . stock watering purposes." *See* Pl. Resp. at 8-19 (citing *Salopek*, 564 P.2d at 615-16; *New Mexico*, 438 U.S. at 716). These decisions reviewed a Special Master's findings of fact and conclusion of law that the Government owned "reserved water rights for minimum instream flows and for recreational purposes within the Gila National Forest." *Salopek*, 564 P.2d at 616. *Salopek* and *New Mexico*, however, held only that "reserved" stock-watering rights in the Rio Mimbres River System must be "allocated under state law to individual stockwaterers." *See id.* at 615-16; *see also New Mexico*, 438 U.S. at 716. Accordingly, that is what the state court did in the *Mimbres* Adjudication, awarding ownership of 26 water sources in the Allotments to the Government. *See id.*; *see also* Dominguez Order (Def. Ex. 25); Oliver Order (Def. Ex. 26); 1990 Amended Stipulation (Def. Ex. 27); Order Approving Amended Stipulation (Def. Ex. 28). Therefore, Plaintiffs' claim that the 1990 Amended Stipulation did not award the United States *exclusive* ownership rights to the water in the Allotments for stock-watering purposes is beside the point. *See* Pl. Resp. at 9 (citing Def. Ex. 27 (1990 Amended Stipulation)). As a matter of law, Plaintiffs retained *no* stock watering rights in the Allotments that were subject to the *Mimbres* Adjudication, regardless as to the scope of the Government's rights thereto. *See* Dominguez Order (Def. Ex. 25); Oliver Order (Def. Ex. 26); Order Approving Amended Stipulation (Def. Ex. 28).

The court also rejects Plaintiffs' contention that they are the true owners of the water sources in the Allotments, because Plaintiffs have made "beneficial use" of the water in the Allotments for grazing, but the Government has not. *See* Pl. Resp. at 15-16 (citing *Walker IV*, 162 P.3d at 888-89 ("Under the [D]octrine of [P]rior [A]ppropriation, water rights are both established and exercised by beneficial use . . . that right must be exercised or lost; one cannot sit on water rights to the exclusion of any other claimant without putting them to beneficial use.")). Whether the Government is required to make "beneficial use" of these water sources under state law is not relevant to the issue of whether Plaintiffs had ownership rights in the 26 water sources in the Allotments subject to the *Mimbres* Adjudication. *See* Def. Ex. 25-27.

Next, Plaintiffs argue that the Government may only maintain ownership of water sources in the Allotments "in trust" for beneficial users, such as Plaintiffs. *See* Pl. Resp. at 16-17 (citing *Pioneer*, 157 P.3d at 602) (holding that the United States Bureau of Reclamation had only nominal legal title to water rights at issue, and that "equitable title" rested with landowners making beneficial use of the water.). First, *Pioneer* has no precedential effect as it is a decision of an Idaho court concerning Idaho law. *See Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64, 78-79 (1938) (federal courts exercising jurisdiction in diversity of citizenship cases should apply the affected state's law, except in "matters governed by the Federal Constitution or by Acts of Congress"); *see also Walker IV*, 162 P.3d at 888 ("Our task is to determine whether *New Mexico law* supports the propositions that a water right includes the right to graze on public lands.") (emphasis in original). Second, *Pioneer* concerned ownership of water from dams developed under the Reclamation Act of 1902, but managed by the federal government for public benefit. *See Pioneer Irrigation Dist.*, 157 P.3d at 602-04. Under the Reclamation Act, state water law controls "in the appropriation and later distribution of the water." *Id.* at 604 (citing *Arizona* v. *California*, 373 U.S. 546, 589, 664 (1963)). In this case, however, the Government's rights in the Gila National Forest were derived from the setting aside of a forest reservation, not from the Reclamation Act of 1902. *See Salopek*, 564 P.2d at 617 (discussing the establishment of the Gila National Forest, and the Government's rights thereto under the Creative Act of 1891, 16 U.S.C. § 471, and the Organic Act of 1897, 16 U.S.C. § 475). As such, Congress "impliedly authorized [the President] to reserve 'appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.'" *New Mexico*, 438 U.S. at 699.

Finally, the court rejects Plaintiffs' contention that the *Mimbres* Adjudication determined only Mr. Dominguez's and Mr. Oliver's irrigation water rights, because "stock watering was not mentioned in the orders." *See* Pl. Resp. at 17 (citing Dominguez Order (Def. Ex. 25) and Oliver Order (Def. Ex. 26)). The 1993 Final Decree provides that "all defendants [and] their successors . . . are permanently enjoined from *any diversion or use* of [these waters] except in accordance with the adjudication orders and this decree." Def. Ex. 29 (*Mimbres* Final Decree, Case No. 6326, at 3) (emphasis added). Plaintiffs' argument is contradicted by the definitive language of the 1993 Final Decree. *See* Def. Ex. 29 (*Mimbres* Final Decree, Case No. 6326, at 1-2).

For the aforementioned reasons, the court has determined that, as a matter of law, Plaintiffs have no rights to the 26 water sources in the Allotments, subject to the *Mimbres* Adjudication. *See supra* note 7.

**c. Plaintiffs Own Certain Water Sources Not Subject To The *Mimbres* Adjudication.**

**i. Res Judicata And Collateral Estoppel Do Not Bar Plaintiffs From Asserting Ownership Rights In Fourteen Other Water Sources.**

Plaintiffs also assert ownership rights in 11 springs, 2 tanks, and 1 well in the Allotments that were not subject to *Mimbres* Adjudication. *See* Pl. Resp. at 9-10. The Government responds that the doctrines of res judicata and collateral estoppel preclude Plaintiffs from asserting ownership of all but one of these sources,[9] because Plaintiffs' rights in the Allotments were decided in the *Mimbres* Adjudication. *See* Gov't Reply II at 6-11 (citing *Rosette, Inc*. v. *Dep't of the Interior*, 169 P.3d 704, 713-14 (N.M. Ct. App. 2007)). The court has determined, however, that neither doctrine precludes Plaintiffs from asserting ownership of these other water sources, because the operative facts as to ownership varies. *See Rosette*, 169 P.3d at 713-14 ("Res judicata applies if . . . identity of the cause of action [is the same] in both suits."); *see also id*. (Collateral estoppel requires that "the issue previously decided is identical with the one presented in the action in question[.]"); *Id*. ("The transactional approach requires us to go beyond any similarity in desired outcome and to examine the operative facts underlying the claims made in the two lawsuits.") (internal citations and quotations omitted).

The operative facts necessary to determine Plaintiffs' ownership of these other water sources were not adjudicated in the *Mimbres* Adjudication, preventing the application of res judicata, because the factual and legal elements necessary to establish ownership is dependent on: the length of use; date of first use; type and location of the water source; and actions taken by Plaintiffs and the Government in light of these factors. *See, e.g.*, N.M. Stat. Ann. §§ 72-1-2, 72-1-3, 72-1-4 (official certified copies of declarations filed with the State Engineer establishing water rights vested prior to March 19, 1907, "is prima facie evidence of the truth of their contents."); *see also infra* § 3(C)(2)(c)(iii-v) (detailing the various factors in determining ownership of a water right on public land in New Mexico). With proof of ownership different for each right claimed, collateral estoppel also does not apply because: (i) no "substantial overlap" exists "between the evidence or argument to be advanced [here] and that advanced in the [*Mimbres* Adjudication]" (*See* RESTATEMENT (SECOND) OF JUDGMENTS (1982) ("RESTATEMENT") § 27(c) (key factor in determining if "issues" are identical under collateral estoppel is whether "there [is] a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first")); and (ii) the "new evidence or argument [does not] involve application of the same rule of law as that involved in the prior proceeding." *Id*. (stating that a key factor in determining if "issues" are identical under collateral estoppel is whether "new evidence or argument involve application of the same rule of law as that involved in the prior proceeding"). Finally, Plaintiffs' predecessors' failure to identify and assert ownership of these fourteen other water sources in the *Mimbres* Adjudication

[9] The parties agree that Rustler Spring was not subject to the *Mimbres* Adjudication, because it is part of the Rio Grande watershed. *See* Pl. Resp. at 10; *see also* Gov't SJ Mot. II at 29; Pope Decl. ¶ 23.

is not relevant to application of collateral estoppel. *Id*. § 27(e) ("A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action[.]"); *see also id*. (The RESTATEMENT continues, "[a]nd if preclusive effect were given to issues not litigated, the result might serve to discourage compromise, to decrease the likelihood that the issues in an action would be narrowed by stipulation, and thus to intensify litigation.").

For these reasons, the court has determined that neither res judicata nor collateral estoppel precludes Plaintiffs from asserting ownership rights in the fourteen above referenced water sources.

**ii. New Mexico Law Also Does Not Bar Plaintiffs From Filing Declarations Of Ownership In Fourteen Other Water Sources.**

The Government also argues that, because Plaintiffs' predecessors did not assert ownership rights in these fourteen other water sources in the *Mimbres* Adjudication, Plaintiffs may not claim them by filing Declarations with the State Engineer.[10] *See* Gov't Reply II at 12-13; *see also* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Water Rights).

New Mexico law provides that "[t]he court in which any suit involving the adjudication of water rights may be properly brought shall have exclusive jurisdiction to hear and determine all questions necessary for the adjudication of all water rights within the stream system involved[.]" *See* N.M. Stat. Ann. § 72-4-17. New Mexico Regulation 19.26.2.8, however, states that claimed ownership of water sources may be filed and accepted by the State Engineer, unless a court's orders or decrees bar such filings. *See* 19.26.2.8 NMAC.11 ("No declarations will be accepted for filing within any stream system where an adjudication court has entered an order or decree that operates to bar such claims.").

The 1993 Final Decree does not bar the State Engineer from accepting declarations of water rights that were not subject to the *Mimbres* Adjudication. *See* Def. Ex. 29 at 3 (*Mimbres* Final Decree, Case No. 6326) ("[*c*]*laims* to the right to divert or use the public waters of the Mimbres River Stream System and Mimbres Underground Water Basin *not heretofore filed with the Court, shall not be adjudicated by the Court* except as may be necessary for the correction of mistakes or omissions.") (emphasis added). Likewise, neither the Dominguez nor Oliver Orders, as "expressly approved and confirmed" in the 1993 Final Decree, bar acceptance of such declarations under 19.26.2.8 NMAC.11. *See* Def. Ex. 25 (Dominguez Order); Def. Ex. 26 (Oliver Order). Although the Dominguez and Oliver Order Orders bar Plaintiffs from declaring water rights identified and allocated to the Government or other parties in the *Mimbres* Adjudication, they do not "operate to bar" claims that were neither identified nor adjudicated in that case. *See* 19.26.2.8 NMAC.11 ("No declarations will be accepted for filing within any stream system where an adjudication court has entered an order or decree that operates to bar *such claims*.") (emphasis added).

[10] The Government concedes that the so-called Test Well "was not required to be presented in the Mimbres adjudication." *See* Gov't Reply II at 9 n.7 (citing Def. Ex. 29 (*Mimbres* Final Decree, Case No. 6326)).

New Mexico Statutory Section 72-2-9.1 confirms that "the State Engineer has the authority to administer water right priorities whether or not an adjudication decree has been entered." Gregory C. Ridgley, *New Mexico Water Rights Adjudications: A Century of Addressing Uncertainty*, New Mexico Office of the State Engineer (May 21, 2004), *available at* http://www.ose.state.nm.us/PDF/Legal/Presentations/2004-05-21-gcr-outline-re-adjudication-statutes.pdf; *see also id*. ("In 2003 the [New Mexico] legislature clarified that the State Engineer has the authority to administer water right priorities whether or not an adjudication decree has been entered."); N.M. Stat. Ann. § 72-2-9.1 ("The legislature recognizes that the adjudication process is slow, the need for water administration is urgent, compliance with interstate compacts is imperative and the state engineer has authority to administer water allocations in accordance with the water right priorities recorded with or declared or otherwise available to the [S]tate [E]ngineer.").

Therefore, because neither the 1993 Final Decree nor Dominguez and Oliver Orders "operate [] to bar such claims," Plaintiffs' January 15, 1997 Declarations of Ownership of Water Rights properly were filed and accepted with the State Engineer, pursuant to 19.26.2.8 NMAC.11. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Water Rights File-Stamped in Office of State Engineer); *see also* 19.26.2.8 NMAC.11(d) ("Upon receipt of a declaration or amended declaration a preliminary investigation may be performed by the state engineer. If this preliminary investigation reveals deficiencies in the declaration or amended declaration, the declaration may be returned to the declarant.").

Plaintiffs bear the burden of proving that they own each vested water right claimed. *See Illinois* v. *United States*, 15 Cl. Ct. 399, 410 (1988) ("[T]o make out a claim under the takings clause of the [F]ifth [A]mendment [to the United States Constitution], plaintiff must establish that it was the owner of the property" that was allegedly taken.). Therefore, the court next will analyze Plaintiffs' alleged ownership in the fourteen other water sources not subject to the *Mimbres* Adjudication to determine if Plaintiffs have established genuine issues of fact preventing the entry of summary judgment. *See Anderson*, 477 U.S. at 248 (A factual dispute is "genuine" where a reasonable fact-finder could find for the non-movant.).

#### iii. Plaintiffs Have Established *Prima Facie* Ownership In Eleven Springs.

Plaintiffs claim ownership in eleven springs not subject to the *Mimbres* Adjudication.[11] *See* Walker Decl. II ¶ 9; *see also* Pl. Facts Resp. at 18-19. Plaintiffs base their claims on New Mexico's Water Code providing that all water rights vested, prior to March 19, 1907: "shall relate back to the initiation of the claim" and "shall be recognized as of the same force and effect" as rights filed after 1907; and that official ownership declarations of those rights filed with the State Engineer is "prima facie evidence of the truth of their contents." Pl. Resp. at 7 (citing N.M. Stat. Ann. §§ 72-1-2, 72-1-

[11] These include: Bath Tub Spring; Cold Spring; Gold Pan Spring; Little Gallinas Spring; Nan Cabin Spring; Upper Cold Spring; Turkey Spring; Yellow Jacket Seep; Dead Man Spring; Maverick Spring; and Rustler Spring. *See* Gov't SJ Mot. II at 26; *see also* Pope Decl. ¶¶ 23, 25; Pl. Facts at 4-5.

3, 72-1-4). Plaintiffs assert that their ownership in these springs preceded 1907 and are "vested." *See* Pl. Facts Resp. at 20 ("Plaintiffs were not required to apply for water right permits from the State of New Mexico for these eleven springs, because Plaintiffs have vested rights to these springs."); *see also* Pl. Resp. at 2 ("Therefore, as early as 1888, [Plaintiffs'] predecessors-in-interest grazed cattle in the land currently designated as [the Allotments], where Plaintiffs have grazing rights and water rights."). In support, Plaintiffs submitted copies of 1997 Declarations of Ownership filed with the New Mexico State Engineer's Office. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Water Rights). Plaintiffs also have submitted Affidavits from Predecessors-in-Interest, Mr. Dominguez and Mr. Oliver, that these springs continuously were "used or possessed" by them prior to the 1994 sale of the ranch to Plaintiffs. *See* Walker Decl. Ex. B (Feb. 24, 1997 Dominguez Affidavit); Walker Decl. Ex. G (Feb. 24, 1997 Oliver Affidavit).

The Government responds that eight of the eleven so-called "springs" are "intermittent water sources that are only present following recent precipitation," or do not exist in Government records.[12] *See* Gov't SJ Mot. II at 29-30. "Intermittent water sources," however, are not considered public water subject to appropriation under New Mexico law, but instead belong "to the owner of the land upon which [they are] found." *Id.* at 30 (citing *Burgett* v. *Calentine*, 242 P.2d 276, 277 (N.M. 1951) ("The law of appropriating water does not apply to springs which do not have a well defined channel through which the water can flow."); *see also* Pope Decl. ¶¶ 10-26 (concluding, after comparing water sources documented by Forest Service records in the Allotments with the Amended Stipulation entered in the *Mimbres* Adjudication and the Declaration of Plaintiff Shellie Walker and affidavits of Plaintiffs' predecessors-in-interest, that these eight alleged "springs" are intermittent water sources or do not exist in Government records); Walker Decl. Ex. B, G (Feb. 24, 1997 Dominguez and Oliver Affidavits). Therefore, the United States, as owner of the Allotments in which these water sources are found, is also the owner of these water sources. *See* Gov't SJ Mot. II at 30 (citing *Burgett*, 242 P.2d at 277 ("The law of appropriating water does not apply to springs which do not have a well defined channel through which the water can flow.")).

Plaintiffs have produced copies of 1997 Declarations of Ownership with the New Mexico State Engineer's Office to establish ownership of these eight springs. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Water Rights). Under New Mexico law, certified copies of such declarations are "*prima facie* evidence of the truth of their contents." *See* N.M. Stat. Ann. § 72-1-3 ("Such records or copies thereof officially certified shall be prima facie evidence of the truth of their contents."). Plaintiffs also have submitted affidavits of their Predecessors-in-Interest stating that these springs continuously were "used or possessed" by them prior to the 1994 sale of the property to Plaintiffs. *See* Walker Decl. Ex. B (Feb. 24, 1997 Dominguez Affidavit); *see also* Walker Decl. Ex. G (Feb. 24, 1997 Oliver Affidavit). Plaintiffs also established that ownership rights attached prior to 1907. *See* Pl. Facts Resp. at 20 ("Plaintiffs were not required to apply for water right permits from the State of New Mexico for these eleven springs, because Plaintiffs have vested rights to these springs."); *see also* Pl. Resp. at 2 ("Therefore, as early as 1888, [Plaintiffs'] predecessors-in-interest

[12] These "springs" include: Bath Tub Spring; Cold Spring; Gold Pan Spring; Little Gallinas Spring; Nan Cabin Spring; Upper Cold Spring; Turkey Spring; and Yellow Jacket Seep. *See* Pope Decl. ¶ 25; *see also* Pl. Facts at 4-5.

grazed cattle in the land currently designated as [the Allotments], where Plaintiffs have grazing rights and water rights."). Although Mr. Pope's Declaration that these "springs" are intermittent water sources that belong to the United States is probative, his opinion alone cannot rebut Plaintiff's *prima facie* evidence of ownership. *See Anderson*, 477 U.S. at 248.

As to the dispute over the three remaining springs,[13] the Government claims that the *Mimbres* Adjudication adjudicated all water rights then-existing in the Allotments. *See* Gov't SJ Mot. II at 26. Therefore, any rights in the Allotments not identified in the *Mimbres* Adjudication would have been created during or after the Adjudication. *Id*. As such, Plaintiffs can only perfect rights to these springs by obtaining both: a permit from the State Engineer, because the water was developed after 1907; and permission to utilize the source from the Government, because the water sources are on Government land. *Id*. (citing *Elephant Butte Irrig. Dist*. v. *Regents of N.M. State Univ*., 849 P.2d 372, 375-76 (N.M. Ct. App. 1993) ("[I]ndividuals seeking to appropriate water after [March 19, 1907] are required to seek a permit from the [S]tate [E]ngineer.")); *see also* N.M. Stat. Ann. 1978 § 72-12-1.2 (requiring that applicants for livestock watering uses on federal land submit proof that the applicant is legally entitled to place livestock on the land where the water is located and has been granted access to the well/drilling site). Any post-1907 rights obtained under a "water permit" are limited and may mature into a "vested water right" only pursuant to New Mexico statute. *Id*. at 27 (citing *Hanson* v. *Turney*, 94 P.3d 1, 3 (N.M. Ct. App. 2004) ("A water permit is an inchoate right, and is the *necessary first step* in obtaining a water right.") (internal quotations omitted) (emphasis added)). Mr. Pope advised the court that two of these three springs were developed during the *Mimbres* Adjudication. *See* Pope Decl. ¶ 23 ("Dead Man Spring and Maverick Spring were developed in 1986 and 1987, respectively, during the adjudication of the Mimbres Watershed."). Therefore, Plaintiffs do not own rights to Dead Man Spring and Maverick Spring, because any rights therein were not properly perfected by Plaintiffs. *See* Gov't SJ Mot. II. at 29.

Nevertheless, Plaintiffs claim ownership of all three springs under the Prior Appropriation Doctrine, because Plaintiffs' predecessors perfected these rights through appropriation and Plaintiffs and their predecessors have made continuous and "beneficial use" thereof prior to and since March 19, 1907. *See* Pl. Resp. at 2 ("Therefore, as early as 1888, [Plaintiffs'] predecessors-in-interest grazed cattle in the land currently designated as [the Allotments], where Plaintiffs have grazing rights and water rights."); *see also* Walker Decl. Ex. B (Feb. 24, 1997 Dominguez Affidavit); Walker Decl. Ex. G (Feb. 24, 1997 Oliver Affidavit). When Plaintiffs filed a Declaration of Ownership with the State Engineer, those rights were perfected. *Id*. at 10-11 (citing N.M. Stat. Ann. § 72-1-2, § 72-1-3, § 72-12-4, § 72-12-5, § 72-12-6); *see also* Walker Decl. II ¶ 5 (attesting to same); Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Water Rights).[14] Although Plaintiffs failed to present

[13] These three springs are: Dead Man Spring, Maverick Spring, and Rustler Spring. *See* Gov't SJ Mot. II at 26; *see also* Pope Decl. ¶ 23; Pl. Facts at 4-5.

[14] Plaintiffs also argue that Dead Man Spring and Maverick Spring, as natural springs, could not be "developed," and Mr. Pope's statement to the contrary "provides no basis or evidence for his statement that 'Dead Man Spring and Maverick Spring were developed in 1986 and 1987 respectively.'" *See* Pl. Resp. at 11 (quoting Pope Decl. ¶ 23).

evidence that rebutted Mr. Pope's belief that "Dead Man Spring and Maverick Spring were developed in 1986 and 1987," *see* Pope Decl. ¶ 23, Plaintiffs have produced copies of their 1997 Declarations of Ownership with the New Mexico State Engineer's Office. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Water Rights); *see also* N.M. Stat. Ann. § 72-1-3 ("[Officially Certified Declarations of Ownership] shall be prima facie evidence of the truth of their contents."). Accordingly, Mr. Pope's opinion alone cannot rebut Plaintiffs' *prima facie* showing of ownership of the above referenced springs.

For these additional reasons, the court has determined that Plaintiffs have made a *prima facie* showing that a genuine issue of fact exists as to the ownership of all eleven springs at issue. *See* *Anderson*, 477 U.S. at 248.

#### iv. Plaintiffs Have Established *Prima Facie* Ownership In The Royal John Tank.

The parties also dispute the ownership of two tanks in the Allotments, not subject to the *Mimbres* Adjudication. Plaintiffs claim ownership of Twin Calf Tank and Royal John Tank, because the former was "constructed under the supervision of Louis Oliver and completed in 1978," and the Royal John Tank beneficially was used by Plaintiffs and their predecessors for stock watering purposes. *See* Pl. Resp. at 12-13; *see also* Walker Decl. Ex. G (Feb. 24, 1997 Oliver Affidavit confirming use and ownership of both tanks since 1971); Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Livestock Water Dam or Tank). The Government counters that Twin Calf Tank was constructed in 1991 and is owned by the Government. *See* Gov't SJ Mot. II at 27-28; *see also* Pope Decl. ¶ 18 ("I was also able to determine that Twin Calf Tank was listed in both the Walker documents and the Forest Service record . . . but was not found in the Amended Stipulation, due to being constructed in 1991, during the adjudication of the Mimbres Watershed."). The Government also represents that Royal John Tank "is believed to be a sediment retention structure built below [a mine] and thus is not a water source developed for stock watering purposes." Gov't SJ Mot. II at 28; *see also* Pope Decl. ¶ 19 ("I was able to determine that Royal John Tank was listed in the Walker documents, but not in the Forest Service record as shown below. I suspect this dam is a sediment retention structure constructed . . . below the Royal John mine.").

Plaintiffs, however, have produced affidavits and declarations asserting that the Twin Calf Tank has been in continuous use by Plaintiffs' predecessors and Plaintiffs since at least March 19, 1907. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Livestock Water Dam or Tank: Twin Calf Tank). Plaintiffs also insist that Louis Oliver constructed the Twin Calf Tank in 1978. *See* Pl. Resp. at 12; *but see* Walker Decl. Ex. G (Feb. 24, 1997 Oliver Affidavit) (confirming use and ownership of the Twin Calf Tank since 1971). Plaintiffs' 1997 Declaration asserting ownership of the Twin Calf Tank also states that this tank was not completed until 1978. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Livestock Water Dam or Tank: Twin Calf Tank) ("[T]ank was constructed under the supervision of Louis Oliver and was completed in 1978."). Filing a declaration of water right perfected after 1907, however, is not *prima facie* evidence of ownership. *See* N.M. Stat. Ann. § 72-1-2, § 72-1-3, § 72-1-4, § 72-12-4, § 72-12-5, § 72-12-6. In fact, any water right developed after 1907 on Government land can only be perfected by the claimant obtaining a permit from the State Engineer and then obtaining permission to utilize the source from

the Government. *See Elephant Butte Irrig. Dist.*, 849 P.2d at 375-76 ("[I]ndividuals seeking to appropriate water after [March 19, 1907] are required to seek a permit from the [S]tate [E]ngineer."); *see also* N.M. Stat. Ann. § 72-12-1.2 (requiring that applicants for livestock watering uses on federal land submit proof that the applicant is legally entitled to place livestock on the land where the water is located and has been granted access to the well/drilling site). Because Plaintiffs have failed to submit proof, or even allege, that they followed and met these requirements, they have not produced sufficient evidence to withstand summary judgment on the issue of ownership of the Twin Calf Tank. *See Anderson*, 477 U.S. at 249-50 ("[I]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted.") (citations omitted).

Plaintiffs, however, have submitted *prima facie* evidence that their ownership rights to the Royal John Tank have been perfected. *See* N.M. Stat. Ann. § 72-1-3 ("[Officially Certified Declarations of Ownership] shall be prima facie evidence of the truth of their contents."); *see also* Walker Decl. Ex. G (Feb. 24, 1997 Oliver Affidavit affirming use and ownership of Royal John Tank since 1971); Pl. Resp. Ex. A (Jan. 15, 1997 Declarations of Ownership of Livestock Water Dam or Tank: Royal John Tank). Although Mr. Pope "suspects" that "this dam is a sediment retention structure constructed . . . below the Royal John mine," a conjecture cannot rebut Plaintiffs' *prima facie* evidence of ownership of this tank. *See Anderson*, 477 U.S. at 248.

For these reasons, the court has determined that Plaintiffs have made a *prima facie* showing that a genuine issue of fact exists as to ownership of the Royal John Tank.

#### v. Plaintiffs Have Not Established *Prima Facie* Ownership In The Test Well.

The parties also dispute the ownership of the Test Well in the Allotments. *See* Gov't SJ Mot. II at 28-29; *see also* Pl. Resp. at 13-14. Plaintiffs claim ownership of the Test Well under the Prior Appropriation Doctrine, because Plaintiffs' predecessors perfected this right, through appropriation and "beneficial use," prior to March 19, 1907. *See* Pl. Resp. at 10; *see also id.* at 2 ("Therefore, as early as 1888, [Plaintiffs'] predecessors-in-interest grazed cattle in the land currently designated as [the Allotments], where Plaintiffs have grazing rights and water rights."). As such, Plaintiffs only were required to file a declaration of ownership with the State Engineer, which Plaintiffs did. *Id.* (citing N.M. Stat. Ann. § 72-1-2, § 72-1-3, § 72-1-4, § 72-12-5, § 72-12-6); *see also* Walker Decl. II ¶ 5 (same); Pl. Resp. Ex. A (Jan. 15, 1997 Declaration of Owner of Underground Water Right: Test Well).

The Government contends that Plaintiffs have failed to establish ownership of the Test Well, because: it is a "mineral exploration core drill hole that has never been developed into a producing water well" (*see* Gov't SJ Mot. II at 28-29 (quoting Pope Decl. ¶ 21)); and Plaintiffs failed to perfect their right by obtaining a permit from the State Engineer and permission to utilize the source from the Government. *See* Gov't SJ Mot. II at 28; *see also id.* at 26 (citing *Elephant Butte Irrig. Dist.*, 849 P.2d at 375-76 ("[I]ndividuals seeking to appropriate water after [March 19, 1907] are required to seek a permit from the [S]tate [E]ngineer.")); N.M. Stat. Ann. § 72-12-1.2 (requiring that applicants for livestock watering uses on federal land submit proof that the applicant is legally entitled to place

livestock on the land where the water is located and has been granted access to the well/drilling site).

Plaintiffs represent that the Test Well was in continuous use by Plaintiffs' predecessors prior to March 19, 1907 and subsequently by Plaintiffs. Plaintiffs' January 15, 1997 Declaration of Ownership with the State Engineer, however, states that the Test Well was drilled in 1975. *See* Pl. Resp. Ex. A (Jan. 15, 1997 Declaration of Owner of Underground Water Right: Test Well) ("Description of well: date drilled 1975[;] driller Gulf Mineral[;] depth 3000 feet."). Accordingly, since the January 15, 1997 Declaration admits that the Test Well was not developed until 1975, Plaintiffs must obtain a permit from the State Engineer, as well as permission to utilize the well from the Government. *See Elephant Butte Irrig. Dist.*, 849 P.2d at 375-76 ("[I]ndividuals seeking to appropriate water after [March 19, 1907] are required to seek a permit from the state engineer."); *see also* N.M. Stat. Ann. § 72-12-1.2 (requiring that applicants for livestock watering uses on federal land submit proof that the applicant is legally entitled to place livestock on the land where the water is located and has been granted access to the well/drilling site). Because Plaintiffs have failed to submit proof, or even allege, that they met these requirements, Plaintiffs cannot withstand summary judgment on the issue of ownership of the Test Well. *See Anderson*, 477 U.S. at 249-50.

**d. The Government Has Not Taken Any Property Interest Owned By Plaintiffs.**

**i. In Water Rights Not Subject To The *Mimbres* Adjudication.**

The Complaint asserts that the Government "has taken [P]laintiffs' rights in water found or originating on federal lands," because the Government's actions "have prevented [P]laintiffs from having access to said water necessary to enable [P]laintiffs to make beneficial use of said water." Compl. ¶ 32. The Complaint also asserts that the Government has "physically appropriated waters" belonging to Plaintiffs for the Government's "own use and the use of third parties." *Id.* Finally, the Complaint alleges that the Government "has imposed conditions on access to [P]laintiffs' water [and] interfered with the acquisition and maintenance of improvements necessary to obtaining and using [Plaintiffs' water]." *Id.*

The Government responds that "Plaintiffs' claim that their access rights have been taken [is] dependent upon the assertion that their right to access water rights . . . includes an implicit right to graze cattle on the lands[.]" Gov't SJ Mot. II at 31. The Supreme Court of the State of New Mexico, however, has held that "the laws of New Mexico do not support the [Plaintiffs'] claim to a forage right on federal lands implicit in their right-of-way for maintenance and enjoyment of a vested water right." *Walker IV*, 162 P.3d at 896. Therefore, the Government's cancellation of Plaintiffs' grazing permit did not "take" water rights from Plaintiffs under the Fifth Amendment. *See* Gov't SJ Mot. II at 31-32. The Government also argues that "to the extent that Plaintiffs are alleging a taking of their water rights and access rights . . . independent of a grazing or forage right, that claim also fails," because Plaintiffs have not attempted to access or utilize their water. *Id.* at 32-34.

Cancellation of Plaintiffs' grazing permit also did not place any limit on Plaintiffs' alleged right to certain water sources. Indeed, the Prior Appropriation Doctrine ensures that owners may transfer, lease, or sell such rights from the surrounding lands. *Id*. at 890 (citing N.M. Stat. Ann. § 72-5-23 (change of place of use); N.M. Stat. Ann. § 72-5-24 (change of purpose); N.M. Stat. Ann. § 72-12-7 (change of location of well for groundwater); *see also KRM, Inc*. v. *Caviness*, 122 N.M. 389, 390 (Ct. App. N.M. 1996) ("A vested right to use water is a protected property right that can be sold, leased, or transferred."). Plaintiffs, however, have not alleged nor submitted any evidence that their ability to transfer, lease, or sell any water rights has been impaired. *See* Gov't SJ Mot. II at 33, n.17 ("Plaintiffs do not allege . . . that they have sought access to their water rights (other than through the grazing of livestock) or permission to move water off the Allotment, and that such permission has been denied."). In fact, Plaintiffs concede that they "could still bring their cattle to their vested water rights for stock watering purposes, as long as the cattle did not graze along the way." Pl. Resp. at 19. Plaintiffs further concede that they have "not sought permission to move any water [in the Allotments from the Government] because of this pending litigation." Pl. Facts Resp. at 22. Nonetheless, Plaintiffs argue "[t]he choices presented to [Plaintiffs with respect to water access] are logistically impossible and economically prohibitive." *See* Pl. Resp. at 19. As the Supreme Court of the State of New Mexico observed, however, "[b]ecause [Plaintiffs] chose not to comply with the government's permitting process, they took the risk of either forfeiting their water right through non-use or being forced to transfer, lease, or sell that right." *Walker IV*, 162 P.3d at 892. Indeed, "if one acquires a water right by beneficially using water in a milling operation, which operation is subsequently shut down due to environmental violations, the mill operator cannot claim a right to continue milling just to protect the water rights." *Id*. Regrettably, that analogy applies here.

Finally, the court rejects Plaintiffs' argument that the Government has "den[ied] plaintiffs all economically-viable use of said water, and depriv[ed] plaintiffs of their reasonable, investment-backed expectations[.]" Compl. ¶ 32. To establish ownership of a constitutionally-protected property interest, Plaintiffs are required to present a "legitimate claim of entitlement" to the property at issue, that is, a "claim of entitlement created and defined by 'existing rules or understandings that stem from an independent source such as state law.'" *See Centro Medico de Turabo, Inc*. v. *Feliciano de Melecio*, 406 F.3d 1, 8 (1st Cir. 2005) (quoting *Bd. of Regents* v. *Roth*, 408 U.S. 564, 577 (1972)). By contrast, "'an abstract need or desire' or a 'unilateral expectation' are not sufficient to cement a constitutionally protected interest." *Id*. Therefore, Plaintiffs' expectations that they indefinitely could use water in the Allotments for grazing purposes is a "unilateral expectation," not a "constitutionally protected interest." *See* Compl. ¶ 32.

For these reasons, the court has determined that Plaintiffs have not made a *prima facie* showing that a genuine issue of fact exists that Plaintiffs have attempted to utilize their alleged ownership rights in certain water sources not subject to the *Mimbres* Adjudication since the start of this controversy, or that the Government has deprived Plaintiffs of these alleged rights. Therefore, as a matter of law, the Government did not take any of Plaintiffs' ownership rights in water sources for a "public purpose." *See Illinois*, 15 Cl. Ct. at 410 ("In order to make out a claim under the takings clause of the [F]ifth [A]mendment, plaintiff must establish that it was the owner of property, and that such property was taken by the United States for a public purpose.") (citation omitted).

**ii. In Preference Grazing Rights.**

The court previously concluded that Plaintiffs have no preference grazing rights in the Allotments, a prerequisite to assert a takings claim. *See supra* § 3(C)(2)(a); *see also Illinois*, 15 Cl. Ct. at 410 ("In order to make out a claim under the takings clause of the [F]ifth [A]mendment, plaintiff must establish that it was the owner of property[.]") (citation omitted).

**iii. In The Walker Ranch.**

The Complaint also asserts that "[the Government] has taken Plaintiffs' Ranch" through the Government's "taking of said water, forage, and grazing land rights" that "deprives [Plaintiffs] all economically viable use of the Ranch" and "deprive[s] [P]laintiffs of their reasonable, investment-backed expectations." Compl. ¶ 33. In the Response to Defendant's Motion for Summary Judgment, Plaintiffs confirm that they are asserting a regulatory taking and are not "claiming the [grazing] permits give them any compensable rights," but rather that Plaintiffs "had reasonable-backed expectations when they acquired their [Ranch] that access to their water rights would not be economically prohibitive." Pl. Resp. at 19-20 (citing *Lucas* v. *S.C. Coastal Council*, 505 U.S. 1003, 1027, 1031 (1992) (holding that where a Government regulation deprives a private landowner of all economically beneficial use of the owner's land, compensation is required unless "the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with."); and *Curtin* v. *Benson*, 222 U.S. 78, 86 (1911) (holding that the Government cannot use sovereign powers to destroy essential uses of private property, including the right of a private owner to graze cattle upon his private land within a national park.)). The court does not consider *Lucas* applicable here, because Plaintiffs have made no *prima facie* showing that the Walker Ranch has no economic value. Likewise, this case is distinguished from *Curtin*, because Plaintiffs' right to graze cattle was dependant on compliance with the terms of the permit that Plaintiffs mistakenly decided to ignore.

The United States Court of Appeals for the Federal Circuit recently rejected a similar takings claim under analogous facts. *See Colvin Cattle Company* v. *United States*, 468 F.3d 803 (Fed. Cir. 2006). In that case, a cattle company asserted a regulatory taking of a ranch after the Government cancelled the company's term grazing permit in an adjacent allotment. *Id*. at 805. Our appellate court held the fact that the "ranch may have lost value by virtue of losing the grazing lease is of no moment because such loss in value has not occurred by virtue of governmental restrictions on a constitutionally cognizable property interest." *Id*. at 808; *see also United States* v. *Fuller*, 409 U.S. 488, 493 (1973) (the Fifth Amendment "does not require the Government to pay for that element of value based on the use of respondents' fee lands in combination with the Government's permit lands."). Here, too, the Government has not taken or placed restrictions on Plaintiffs' constitutionally-protected property interests in the Walker Ranch.

## IV. CONCLUSION.

For the aforementioned reasons, the Government's August 31, 2007 Motion for Summary Judgment is granted. The Clerk of the United States Court of Federal Claims is ordered to enter a Final Judgment in accordance with this Memorandum Opinion and Final Order.

**IT IS SO ORDERED.**

**s/ Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**